FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

00 JAN 26 AM 10: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

WILL E. BLACKSTON, )
    Plaintiff; )
     )
-vs.- )     No. CV-98-P-2974-S
     )
WARNER-LAMBERT COMPANY, )
    Defendant. )
     )

ENTERED
JAN 26 2000

OPINION

Before the court is the defendant's September 1, 1999 Motion for Summary Judgment, on which oral argument was heard in chambers on October 20, 1999. After careful consideration, the court concludes that the defendant's motion is due to be granted.

Facts[1]

In late 1990 or early 1991, Will Blackston was hired on a part-time basis by Warner-Lambert Company as a Retail Sales Representative. In 1993, he began working full time for the defendant as a Territory Development Representative ("TDR"). As a TDR, the plaintiff's responsibilities included visiting stores within his territory to increase the distribution and in-store display of Warner-Lambert products such as candy, mints and gum. Each TDR must visit each store in his territory at least once every three months, and average 12 stores per day. It is company policy that a TDR complete his daily store calls between the hours of 8 a.m. to 5 p.m.

---

[1] The recitation of facts is presented in the light most favorable to the plaintiff.

1

Every day, each TDR must report in to his supervisor with information regarding the day's calls by leaving a message on Warner's "Voice Com" system.

According to the defendant, in 1995 the plaintiff began act erratically. The plaintiff voiced suspicions that other employees were out to get him, filed a police report against another TDR, and reported a bomb threat against his house to the police and company security. The defendant alleges that the plaintiff's work performance began to suffer at this time. According to the plaintiff's supervisors, Blackston failed to meet his store call quotas, to provide accurate "Voice Com" reports, and to remove expired products from the stores he called on.

On February 6, 1997, the plaintiff interviewed with the defendant for the newly-created position of Account Manager. According to the affidavit of Jennifer Compagni, Warner's former Human Resources Manager, the defendant acted strangely at the interview by making inappropriate comments and appearing suspicious and hostile.

Andy Mayeaux became the plaintiff's supervisor in January 1997. As the plaintiff's supervisor, he occasionally conducted "report checks" by accompanying the plaintiff on his sales calls. Mayeaux also met with the plaintiff for "workwiths" to provide feedback and help Blackston improve his work performance. Mayeaux conducted report checks and "workwiths" with the plaintiff on January 28, 1997, and April 24, 1997, and allegedly discovered deficiencies in the plaintiff's work performance. These included calling on non-consecutive stores, failing to complete a day's calls within business hours, improperly merchandising products, and failing to remove outdated products.

On June 30, 1997, Mayeaux again conducted a "workwith." According to Mayeaux, at this time he conducted a stock audit and discovered a $600 discrepancy. The plaintiff disputed

2

the discrepancy but ultimately reimbursed the company. On August 27, 1997, Mayeaux and Regional Manager James Henckel accompanied the plaintiff on another "workwith." According to both Henckel and Mayeaux, they found serious deficiencies in the plaintiff's work performance and placed Blackston on a 45-day work warning.

Henckel and Mayeaux followed up with a mid-November report check. They determined that Blackston had failed to remedy the problems they had advised him about during the August "workwith." The plaintiff was then placed on a 45-day probation.

On January 8, 1998, Mayeaux and Patricia Cardenas-Randall, a representative from Warner's human resources department, conducted a report check and "workwith" with Blackston. At that time, the plaintiff's probation was extended for an additional sixty days. A follow-up "workwith" occurred on February 2, 1998, after which the plaintiff went on short-term disability leave for an unrelated illness. His probation was therefore continued until May 27, 1998.

Mayeaux and Cardenas-Randall conducted another "workwith" with the plaintiff on May 27th. According to the defendant, the plaintiff performed poorly by continuing to provide inaccurate "voice com" reports and to route his calls unproductively. The plaintiff's probation was again extended for 45 days.

On July 13, 1998, Mayeaux and Cardenas-Randall checked 20 stores that Blackston had recently visited. During these checks, they found that the plaintiff had not accurately reported the store displays he had placed, had not removed expired products, and had not adhered to the defendant's retail priorities. On July 15th, the plaintiff was terminated.

The plaintiff alleges that the defendant discriminated against him on the basis of his

disability-- Attention Deficit Disorder (ADD).[2] ADD is a disorder which affects a person's ability to concentrate and causes difficulties such as hyperactivity and impulsivity. In December 1996 the plaintiff began treatment for ADD with Dr. Rachel Fargason. In January 1997 Dr. Fargason went on maternity leave, and Blackston was treated by her colleague, Dr. Janet Wright. In October 1997 the plaintiff returned to Dr. Fargason, who treated him until March 1999. Dr. Wright placed him on Dexedrine, a medication to alleviate the symptoms of ADD, including inattention and hyperactivity. According to Dr. Fargason, Blackston responded well to the medication. In October, Dr. Fargason also placed him on Risperdal, an anti-psychotic drug to help his mild paranoia, and later she added an antidepressant.

The plaintiff notified Mayeaux in August 1997 that he suffered from ADD and that it was likely causing his difficulties at work. Representatives of the defendant asked Blackston to contact the company doctor regarding his ADD. Blackston refused to do so, and told the defendant that he did not want the company doctor to contact his physician. The company physician did contact the plaintiff's doctor to determine that the plaintiff was in fact being treated for ADD, and for general information about the condition. On April 28, 1998, Dr. Rachel Fargason sent a letter to the defendant requesting a number of accommodations for the plaintiff. These included permitting the plaintiff to work later hours and to use a timer, and helping the plaintiff to plan his work efficiently.

On January 27, 1998, the plaintiff filed his first charge of discrimination with the EEOC alleging that the defendant had discriminated against him under the ADA by harassing him,

---

[2]ADD is also known as Attention Deficit Hyperactivity Disorder (ADHD).

disciplining him, and failing to provide necessary accommodations. On September 12, 1998, the plaintiff filed a second EEOC charge, alleging in addition that he had been discriminated against on the basis of his age and that he had been terminated in retaliation for filing his first charge.

The plaintiff filed this lawsuit on November 30, 1998, claiming that he was discriminated against in violation of the ADA, and the ADEA in retaliation for filing an EEOC charge. At oral argument, the plaintiff abandoned his age discrimination claim. Therefore, the court will address only the plaintiff's remaining two claims.

I. ADA Claim

In order to state a prima facie case of discrimination based on his disability, Blackston must show that (1) he has a disability, (2) he is a qualified individual, and (3) he was subjected to unlawful discrimination as a result of his disability. *See Gordon v. E.L. Hamm & Assoc.*, 100 F.3d 907, 910 (11th Cir. 1996). The plaintiff must also show that his employer had actual or constructive knowledge of his disability. *See id.*

The ADA defines "an individual with a disability" as one who:

(1)  has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, or
(2)  has a record of such impairment, or
(3)  is regarded as having such an impairment.

*See* 42 U.S.C. §12102(2). Here, the plaintiff asserts that he is "disabled" as defined under the first and third definitions.

5

A. <u>Is the plaintiff substantially limited in a major life activity?</u>

A physical impairment alone is not necessarily a disability under the ADA. *See Hilburn v. Murata Electronics North America, Inc.*, 1999 WL 509829 at *5 (11th Cir. 1999). The Eleventh Circuit has looked to EEOC regulations for guidance on determining when an impairment constitutes a disability within the meaning of the ADA. *See id.*

The EEOC regulations define a "substantial limitation" as an inability to perform, or a significant restriction in the condition, manner or duration under which an individual can perform, a major life activity as compared to the average person. *See* 29 C.F.R. § 1630.2(j)(l). The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." The plaintiff claims that due to his disability, he was substantially limited in two major life activities: thinking and working.[3]

A court's inquiry into whether an individual is substantially limited in a major life activity is an individualized one, taking into consideration the effect of the impairment on the individual's life. *See Sutton v. United Air Lines, Inc.*, 119 S.Ct 2139, 2147 (1999). A court is also to take into account measures that correct or mitigate the impairment, such as medication or physical aids; however, the plaintiff can still be "disabled" under the ADA, if, despite treatment or corrective devices, he remains substantially limited in major life activities. *See id.* at 2146; *Murphy v. United*

---

[3]To demonstrate that an impairment substantially limits the major life activity of working, a plaintiff must show that he is "significantly restricted in [his] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). The court declines to address here whether the plaintiff was restricted in his ability to perform such a class of jobs because the court finds that the plaintiff was not substantially limited by the ADD from performing his duties as a TDR.

6

*Parcel Service*, 119 S.Ct. 2133 (1999). Based upon the evidence submitted, a reasonable jury could not conclude that Blackston had a mental impairment that substantially limited his ability to think or to work.

While the plaintiff testified that his ADD somewhat affected his ability to work as a TDR, it is clear that his impairment does not rise to the level of substantially limiting a major life activity. The plaintiff's physician testified at her deposition that the symptoms of ADD can be alleviated by different types of treatment: medication, practical management strategies, and pyschotherapy. *See* Fargason Dep. at 15-17. By August 1997, when Blackston told Mayeaux that he had ADD, the plaintiff had been receiving treatment for six to seven months. According to Dr. Fargason and the plaintiff's own testimony, the plaintiff was not limited in any major life activities, including working, while he was taking his ADD medication.[4] Dr. Fargason testified that, when

---

[4] Dr. Fargason testified:
Q. Am I correct that during the time frame that you treated Mr. Blackston and that he was medicated properly that he had no limitations on his life activities?
A. Correct.
Q. Am I correct that when you were treating Mr. Blackston and that he was medicated properly that he had no limitations or restrictions on his work activities?
A. Correct.
*See* Dep. 37-38.

\*\*\*\*\*\*\*\*

Q. Would you agree with this statement that because of his ADHD, he was no longer able to do 71% of the jobs that he was previously able to do?
A. ADHD is a constant condition so it shouldn't- his ability should not change over time.
Q. So you would disagree with that statement?
A. I would disagree with that statement.
Q. I'm going to give you another statement and see if you agree. Would you agree that based on Mr. Blackston's ADHD that he was no longer capable of doing outside sales or dealing with the public?
A. Generally, people with ADHD are very loquacious and do very well interacting with others.
Q. And based on your treatment of Mr. Blackston, when he was taking medication properly, it's your understanding and your opinion that he could deal with the public and be an outside salesperson?
A. There would be no reason why his ADHD would restrict him from such activities.
*See* Dep. at 38-40.

he was medicated, he was not restricted in his life or his activities,[5] as did Dr. Joseph Lucas, who examined the plaintiff in April, 1999.[6]

Blackston's testimony at his deposition that "as long as I'm on my medication, I'm okay" belies any argument that he was substantially limited by his ADD. The plaintiff testified that he was not limited in performing his job when he was properly medicated and provided with certain accommodations, such as a timer, a spell checker, and a change in his work hours. *See* Pl.'s Dep. at 113-14.

The evidence reflects that the defendant extended accommodations to the plaintiff and on a number of occasions the plaintiff's supervisors met with the plaintiff to help him improve his work performance. The extent and nature of the plaintiff's impairment does not qualify as a "disability" under the ADA because the evidence does not support a conclusion that the plaintiff was substantially limited in performing any specific tasks. The mere fact that the defendant found the plaintiff's work performance to be deficient in a number of areas is not sufficient to show that he was substantially limited in his ability to work or to think due to his ADD.

B. Was the plaintiff "regarded as" disabled?

The plaintiff may qualify under the ADA if he can show that the defendant perceived him as having a substantially limiting disability. The evidence shows that the plaintiff's argument that the defendant regarded him as disabled is without merit. Blackston submits as evidence that the

---

[5]According to Fargason, Blackston never told her that he was incapable of participating in any activities because of his impairment. *See* Dep. at 44.

[6]*See* Lucas Dep. at 31-32.

defendant regarded him as disabled: that he told Mayeaux that he had ADD; that he was put on probation after August 1997; that "the company relied on Blackston's repeated reference to ADD as contributing to his poor work performance." Pl.'s Brief at 3, that the defendant offered him some accommodations, and Mayeaux felt that Blackston "just couldn't do it."

A reasonable jury could not conclude from these allegations that Warner Lambert regarded the defendant as substantially limited in a major life activity. Mere knowledge that the plaintiff suffered from ADD is not sufficient to show that the defendant perceived him as disabled; neither is the fact that the plaintiff informed the defendant that ADD caused his difficulties at work. The impairment "must be viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks." *Gordon*, 100 F.3d at 913.

The evidence suggests that the defendant sought to help the plaintiff improve his job performance, and offered him the opportunity to meet with a company physician to determine if accommodations to his ADD could be made.[7] After being informed of the plaintiff's impairment, his supervisors conducted numerous "workwiths" with the plaintiff and extended his probation on a number of occasions. A reasonable jury could not conclude from this evidence that the plaintiff's supervisors viewed him as incapable of, or substantially limited in, performing his job as a TDR.

II. Retaliation Claim

The defendant argues that summary judgment is due to be granted as to the plaintiff's retaliation claim because the plaintiff has not contested or otherwise responded to the defendant's

---

[7]The evidence also reflects that, for a substantial amount of time, the plaintiff would not meet with the company physician or permit that doctor to contact his treating physician to discuss his ADD.

9

motion on this claim. Although, as the plaintiff points out, "[p]laintiff says the word RETALIATION in its (sic) brief," *see* Pl.'s Reply Brief at 1, the mere mention of the word is not sufficient to survive summary judgment. Aside from the fact that the plaintiff filed an EEOC charge six months before he was terminated, the plaintiff has failed to provide any credible evidence in support of his retaliation claim. Therefore, this claim is due to be dismissed.

Conclusion

For the foregoing reasons, the defendant's summary judgment motion is due to be granted in full.

Dated: Jan. 25, 2000

_____
Judge Sam C. Pointer, Jr.

Service List:
    John J. Coleman, III.
    Karen R. Cashion
    Nathan Dewayne Pope
    Craig M. Frankel
    Jeffrey W. Bennitt
    Kenneth F. Gray, Jr.